**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE:** | ) **Case No.** 15-20390 CMB |
| | ) |
| North Shore Energy Services, LLC, | ) **Chapter** 11 |
| | ) |
| **Debtor.** | ) Document No. |

_____

**CHAPTER 11 PLAN OF REORGANIZATION**

_____

**Donald R. Calaiaro, Esquire**
**CALAIARO VALENCIK**
**428 Forbes Avenue, Suite 900**
**Pittsburgh, PA  15219-1621**
**(412) 232 – 0930**

**DATED: September 10, 2015**

## <u>TABLE OF CONTENTS</u>

1.    Definitions                                                          Page 3

2.    Classification of Claims and Equity Interests into Classes      Page 8

3.    Designation of Classes                                          Page 8

4.    Impairment                                                      Page 13

5.    Implementation of the Plan                                      Page 13

6.    Provisions for Claims; and Equity Security Interests Generally      Page 30

7.    Treatment under the Plan and Provision for Payment              Page 31

8.    Retention of Jurisdiction                                       Page 45

9.    General Provisions                                              Page 46

10.   Amendment                                                       Page 47

11.   Certificate of Service                                          Page 48

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE:** | ) **Case No.**  15-20390 CMB |
| North Shore Energy Services, LLC, | ) **Chapter** 11 |
| **Debtor.** | ) **Document No.** |

## CHAPTER 11 PLAN OF REORGANIZATION

**North Shore Energy Services, LLC,** Debtor-In-Possession, proposes the following Amended Plan of Reorganization ("Plan") pursuant to Section 1121(b) and (c) of the Bankruptcy Code ("Code"), 11 U.S.C. Section 1121(b) and (d).

## ARTICLE 1 - DEFINITIONS

For purposes of this Plan, except as otherwise expressly provided herein or unless the context otherwise requires, the following capitalized terms shall have the meaning set forth below:

**1.1**    Adequate Protection Payments: shall mean payments made between the filing date and confirmation date by **North Shore Energy Services, LLC,** in respect to secured claims. No payments were made prior to September 10, 2015.

**1.2**    Administrative Claims: shall mean the costs and expenses of administration of this Chapter 11 case allowed under Section 503(b) and entitled to priority under Section 507(a)(1) of the Code.

**1.3**    Allowed Claim: shall mean a claim against the Debtor to the extent.

**a.**    A proof of such claim was:

    **(1)**    Timely filed; or

    **(2)**    Deemed filed pursuant to Section 1111(a) of the Bankruptcy Code; or

    **(3)**    Filed late with leave of the Bankruptcy Court after notice and opportunity for a hearing given to the Debtor's counsel; and

**b.**   **(1)**   Which is not a Disputed Claim; or

**(2)**   Which is allowed (and only to the extent allowed) by a Final Order, after objection, if any, and hearing; and

**c.**   **(1)**   With respect to any professionals seeking compensation in connection with this case, when said compensation has been allowed by Order of the Bankruptcy Court after notice and hearing as provided in the Bankruptcy Code; or

**(d)**   Deemed filed pursuant to the approved settlement agreement reached by and between the Debtor and JMC Brine Box LLC and/or Ray Jordan.

**1.4**   <u>Litigation</u>: shall mean actions in the United States District Court or Bankruptcy Court for the Western District of Pennsylvania with any caption including Debtor; and any action involving the Debtor in any court of competent jurisdiction whether or not they are pending at the time this Plan is filed.

**1.5**   <u>Bankruptcy Court</u>: shall mean that unit of the United States District Court for the Western District of Pennsylvania known as the United States Bankruptcy Court for the Western District of Pennsylvania located at 54th Floor, U.S. Steel Tower, 600 Grant Street, Pittsburgh, Pennsylvania, 15219, or any Court having jurisdiction to hear and determine appeals therefrom.

**1.6**   <u>Business Day</u>: shall mean between 9:00 a.m. and 5:00 p.m. local Pittsburgh time on every day, except Saturdays, Sundays and national holidays.

**1.7**   <u>Claim</u>: shall have the meaning set forth in Section 101(4) of the Bankruptcy Code.

**1.8**   <u>Class</u>: shall mean the category of holders of claims or equity interests in such category as provided by 11 U.S.C. 1122 of the Code, each such Class being more fully defined in Article 8 of the Plan.

**1.9**    Collateral: shall mean any property in which the Debtor has or had an interest and which secures an allowed claim against the Debtor.

**1.10**   Confirmation Date: shall mean the date when the clerk of the Bankruptcy Court shall have entered the Confirmation Order on the docket.

**1.11**   Confirmation Order: shall mean the Order entered by the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Code.

**1.12**   Convenience Claim- Deleted

**1.13**   Creditor: shall mean any person having a claim against the Debtor that arose on or before the filing date or a claim against the Debtor estate of a kind specified in Section 502(g)(h) or (I) of the Code.

**1.14**   Disclosure Statement: shall mean the Disclosure Statement of the Debtor, and filed with and approved by the Court pursuant to Section 1125 of the Code.

**1.15**   Disputed Claims: shall mean alleged claims against or equity interests in the Debtor listed as disputed, contingent or unliquidated on the Debtor schedules or amended schedules for which a timely proof of claim is filed, or to which an objection has been timely filed within thirty (30) days after the confirmation date by a party in interest and which objection is not the subject of a Final Order or has not been withdrawn.

**1.16**   Distribution Date and Effective Date of the Plan: shall mean for each allowed claim which is to receive cash under the Plan, either **(a)** the thirtieth (30th) business day after the Confirmation Order becomes a Final Order.  On this date, the first distribution will occur to undisputed, allowed secured and priority claims, unless otherwise set forth herein; or **(b)** if a claim is not allowed by the prior date, the sixtieth (60th) business day after the date on which a disputed claim is finally adjudicated and no further

appeal can be taken.

**1.17**   Filing Date: shall mean **February 10, 2015**, the date on which **North Shore Energy Services, LLC,** filed their petition for reorganization with the Bankruptcy Court.

**1.18**   Final Order: shall mean an order, judgment or decree of the Bankruptcy Court as to which **(a)** any appeal that has been timely taken has been finally determined or dismissed; **(b)** the time for appeal has expired and no appeal has been timely taken in accordance with Rule 8002 of the Rules of Bankruptcy Procedure and any applicable local procedural rule; or **(c)** an appeal has been timely taken, but such Order has not been stayed by appropriate cash bond or equivalent under Rule 8005 of the Rules of Bankruptcy Procedure.

**1.19**   Plan: shall mean this Plan of Reorganization dated **September 10, 2015**, as the same may be amended or modified from time to time in accordance with the provisions of this Plan and Section 1127 of the Code, all addenda, exhibits, schedules, releases and other attachments hereto, all of which are incorporated herein by reference as though fully set forth herein.

**1.21**   Priority Claim: shall mean any claim entitled to priority pursuant to Section 507(a) (1) [Administrative] of the Code to the extent it is an allowed claim; except for priority tax claims.

**1.22**   Priority Tax Claim: shall mean any claim entitled to priority pursuant to Section 507(a) (7) of the Code to the extent it is an allowed claim.

**1.23**   Tax Attributes: shall mean any right or claim for credits that the Debtor has as of the date of confirmation of the Plan.

**1.24**   Proponents of this Plan: shall mean **North Shore Energy Services, LLC,**

**1.25**   Schedules: shall mean the schedules of assets and liabilities filed by **North Shore Energy Services, LLC,** with the Bankruptcy Court as required by Section 521 of the Code, and any amendments thereto as allowed by the Bankruptcy Court.

**1.26**   Secured Claim: shall mean an allowed claim in respect of which a security interest is held in or against any property of the Debtor's estate, to the extent of the value of such creditor's interest in the estate's interest in such property; and to the extent the claim is perfected against a trustee under 11 U.S.C. Section 544.  If the value of such creditor's interest is less than the amount of the allowed claim held by it, then such creditor shall hold an unsecured claim for the deficiency amount; if the creditor's claimed security is not perfected, it will have an unsecured claim; but only to the extent the creditor has filed a claim.

**1.27**   Secured Creditor: shall mean any person, which holds a perfected secured claim.

**1.28**   Security Interest: shall mean a lien; as such term is defined in Section 101(33) of the Code on any of the property of the Debtor's estate.

**1.29**   Unsecured Claim: shall mean any claim other than an administrative claim; secured claim or a priority claim to the extent it is an allowed claim.

**1.30**   Gender and Number: when used herein, words importing any gender may be applied to and include all persons; words importing the plural number may be applied to and mean a single person or thing, and words importing the singular number may be applied to and mean more than single person or thing.

**1.31**   General Rule of Interpretation: unless otherwise defined herein, all terms used in this Plan shall have the meanings set forth in the Bankruptcy Code.

1,32 The "Jordan Parties" shall mean the following individuals  Raymond Jordan, Jason Morrow, Ray Jordan,, JMC Brinebox LLC, Jordan Manufacturing Consulting, LLC, Brine Box Services,

1.33 The "Settlement Agreement" shall mean the  Settlement Agreement and Mutual Release between the two parties which resolved their numerous disputes.  The Debtor filed a Motion to Approve this Settlement with the Bankruptcy Court.  No party filed any objection and that the Bankruptcy Court conducted a hearing and approved  this settlement agreement on July 15, 2015, at Document No. 45 in Adversary 15-2055 CMB and at Document No. 26 in Adversary 15-2074 CMB. The "Settlement Agreement" shall mean the settlement and all terms that were approved by the Court.  Was a similar ORDER ENTERED IN THE MAIN CASE.

## ARTICLE 2 - CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS INTO CLASSES

**2.1**    Class 1, Administrative Claims                                   *[Unimpaired]*

**2.2**    Class 2, Matrix Energy Partners                                 *[Impaired]*

**2.3**    Class 3, Jordan Manufacturing, JMC Brine Box, LLC    *[Impaired]*

**2.4**    Class 4, Executory Contract with Michael Havelka       *[Impaired]*

**2.5**    Class 5, General Unsecured Creditors                         *[Impaired]*

**2.5**    Class 6, Insider Loans                                              *[Impaired]*

**2.6**    Class 7, Equity Interests in the Debtor                       *[Impaired]*

## ARTICLE 3 - DESIGNATION OF CLASSES

**3.1**    Class 1 shall consist of fees to the U.S. Trustee; the Clerk of Courts and any professional's fees which are entitled to priority under 11 U.S.C. Section 507(a) (1).

These shall include the following:

    (a)    Any unpaid utility bills for administrative service to the Debtor; any unpaid wages to employees of the Debtor

    (b)    Attorneys for Debtor, Calaiaro Valencik.

    (c)    Any claims which are entitled to administrative claim treatment under 11 U.S.C, §503. This Class includes expenses incurred during the Administration of this case to preserve the Bankruptcy Estate:

    (f)    All U.S. Trustee's fees and Clerk of Bankruptcy Court charges.

    (g)    All professional fees are subject to the Bankruptcy Court's approval under Section 330(a)(1) of the Bankruptcy Code and Bankruptcy Rule 2016(a); and only to the extent professionals preserved the estate.

**3.2**   <u>Class 2</u> shall consist of the secured claim of Matrix Energy Partners, LLC, which holds a $45,000.00 lien on the debtor's Brine boxes. These Brine boxes served as the security for a revolving line of credit granted to the debtor by the Matrix Energy Partners.  This creditor perfected its security interest prior to the commencement of the case.  This is a line of credit and the Debtor may draw on that line and increase the amount due prior to confirmation.   This creditor has agreed to subordinate its lien to Jordan Manufacturing Consulting. This treatment is dictated by the Settlement Agreement and Mutual Release between the two parties. There is a Motion to Approve this Settlement that was heard by the Bankruptcy Court.  The settlement was approved on July 15, 2015, at Document No. 45 in Adversary 15-2055 CMB and at Document No. 26 in Adversary 15-2074 CMB.  One of these cannot be an adversary.  Was a similar ORDER ENTERED IN THE MAIN CASE.

**3.3**   <u>Class 3</u> shall consist of the claim of Jordan Manufacturing Consulting Think we need to name the correct parties per the settlement agreement.  This creditor holds a principal claim of $915,000.00. This claim arose out of the fabrication of the 2 Brine

Boxes.   This amount is dictated by the Settlement Agreement and Mutual Release between the two parties. A Motion to Approve this Settlement was heard by the Bankruptcy Court.  The settlement was approved on July 15, 2015, at Document No. 45 in Adversary 15-2055 CMB and at Document No. 26 in Adversary 15-2074 CMB.[1]  Same comment as above.

**3.4** Class 4 shall consist of the executory contract of the debtor with Michael Havelka for the licensed use of his proprietary information, "The Brine Box Technology". This technology is defined as:

A. The entirety of the Intellectual Property package used in the treating flow back, produced and drilling water as well as a host of related applications of the Brine Box.

B. The Frac View technology that includes the entirety of the Intellectual Property package used in the monitoring and reporting of water quality in the Brine Box for the oil and gas industry, as well as related water recycling applications.

C. The surface modified adsorbent technology that includes surface modified zeolites, activated carbons and activated alumina.   Also included are future modifications that may increase efficiency of the adsorbents in the Brine Box.   The modifications include physical, chemical and thermal technologies.

The Debtor is authorized to use his process[2] for the payment of royalties, as required by the Agreement between Michael Havelka and North Shore Energy Services, LLC, which was reduced to writing on March 26, 2015. The agreement lasts for a five year period. The Parties are required to protect the confidentiality of the Proprietary Information and Process relating to the Brine Box and the media. North Shore Energy

---

[1] The terms and conditions of the Settlement Agreement are incorporated herein and apply to the payment of the claim for this Class.
[2] The Patent is pending.

Services, LLC is required to pay a royalty for the use of this technology:

1. The Brine Box royalty rate shall be calculated monthly based on the price and utilization of the Brine Boxes.   This rate shall be 2% of the gross profit achieved by North Shore Energy Services, LLC.
2. These royalties shall be accrued and payment deferred until North Shore has adequate financial  means to pay these royalties.   In addition, the royalties can be converted to debt or equity instruments at the approval of North Shore's Board of Directors.
3. The Frac View is integral to Brine Box operation and no additional billings are made based on its presence.  The royalties for Frac View are covered in the Brine Box royalty rate.
4. The media royalty rate shall be set at 20% of the net profit (cost of media minus sales price). These royalties shall be accrued and payment deferred until North Shore has adequate financial means.   In addition, the royalties on the media can be converted to debt or equity instruments at the approval of North Shore Board of Directors.

**3.5**    Class 5 shall consist of the debtor's general unsecured creditors. The 5 claims constituting this class are owed approximately $**170,638.77. This does not include insider claims.**

### GENERAL UNSECURED NON-TAX CLAIMS- CLASS 5

| Creditor | Class | Total Amount Owed |
|---|---|---|
| 5J Oil Field Services, LLC | 5 | $15,490.00 |
| Entire Environvemental Services, Inc. | 5 | $6,688.70 |
| ModSpace | 5 | $880.07 |
| Sepratech Corporation | 5 | $5,520.00 |
| Squire Patton Boggs (US) LLP | 5 | $130,000.00 |
| First Insurance Funding | 5 | $4,000.00 |
| TOTAL | | $162,578.77 |

**3.6**    Class 6 shall consist of the general unsecured loans owed by the debtor to insiders. This class consists of 19 loans constituting an aggregate total of $425,000.00:

### GENERAL UNSECURED- INSIDER LOAN CLAIMS- CLASS 6

| Creditor | Class | Total Amount Owed |
|---|---|---|
| David Battista | 6 | $4,000.00 |
| Michael Conway | 6 | $20,000.00 |
| William M. Feczko | 6 | $12,000.00 |
| Michael Havelka | 6 | $120,000.00 |
| Chad Hill | 6 | $40,000.00 |
| Mark Krahe | 6 | $8,000.00 |
| Walter J. & Anna Marie Lang, Jr. | 6 | $4,000.00 |
| David A. Lobaugh | 6 | $16,000.00 |
| James Merkle | 6 | $28,000.00 |
| Brad Prentice | 6 | $4,000.00 |
| Harry & Barbara Ruprecht | 6 | $8,000.00 |
| David Schleis | 6 | $80,000.00 |
| James W. Tate | 6 | $8,000.00 |
| Joseph & Kathleen Battista | 6 | $12,000.00 |
| Lanny E. Pifer | 6 | $20,000.00 |
| Victor Violi | 6 | $4,000.00 |
| Michael & Jennifer Williams | 6 | $8,000.00 |
| Kevin Wisniewski | 6 | $4,000.00 |
| Jimmy Yang | 6 | $29,000.00 |
| TOTAL | | $429,000.00 |

**3.7** _Class 7_ shall consist of parties holding equity interests in the debtor. The

Following is a list of equity members and their percentage of ownership:

| | |
|---|---|
| Brad Prentice, 114 Towne Square Drive, Allison Park, PA 15101 | 0.1000% |
| Chad Hill, P.O. Box 14009, Pittsburgh, PA 15239 | 1.0000% |
| David A. Lobaugh, 124 Circle Drive, Pittsburgh, PA 15237 | 0.4000% |
| DS Tax Advisors, LP, 902 Perry Highway, Pittsburgh, PA 15229 | 54.2350% |
| Harry & Barbara Ruprecht, 2317 Big Rock Road, Allison Park, PA 15101 | 0.2000% |
| James W. Tate, 193 Pine Meadow Drive, Wexford, PA 15090 | 0.2000% |
| Joseph & Kathleen Battista, 490 Browns Lane, Pittsburgh, PA 15237 | 0.4650% |
| Lanny E. Pifer, 123 Sarver Mill Drive, Sarver, PA 16055 | 0.5000% |
| Mark Krahe, 143 Broadbent Road, Sewickley, PA 15143 | 0.2000% |
| Michael & Jennifer Williams, 1313 Sampson Street, Conway, PA 15027 | 0.2000% |
| Michael Conway, 3907 Dewey Avenue, Apt. 1, Pittsburgh, PA 15214 | 1.1000% |
| Northshore Capital LLC, 3471 Babcock Blvd Ste 205, Pittsburgh, PA 15237 | 26.0000% |
| Salvatore Amedure, 9493 Peebles Road, Allison Park, PA 15101 | 0.5000% |

12

SY Management, LP, 3471 Babcock Blvd , Ste. 205, Pittsburgh, PA 15237          3.0000%

Victor Violi, 316 Sunn Hill Drive, Allison Park, PA 15101          0.1000%

Walter J. and Anna Marie Lang, Jr., 4101 Franklin Road, Pittsburgh, PA 15214          0.1000%

William M. Feczko, 230 Highview Avenue, Pittsburgh, PA 15238          0.3000%

## ARTICLE 4 - IMPAIRMENT

The following classes are <u>not</u> impaired under this Amended Plan:

**Class 1**      Unimpaired

The following classes are impaired under the Plan:

**Class 2**      Impaired
**Class 3**      Impaired
**Class 4**      Impaired
**Class 5**      Impaired
**Class 6**      Impaired
**Class 7**      Impaired

## ARTICLE 5 - MEANS FOR IMPLEMENTATION OF THE PLAN

**5.1**      <u>Vesting of Assets in Reorganized Debtor</u>   On the Effective Date of the Plan, by operation of this Plan and the Confirmation Order, all Assets of the Debtor and its estate shall be transferred to, and vest in, the Reorganized Debtor.

**5.2**      <u>The Reorganized Debtor</u>   Pursuant to the Plan and the Confirmation Order, the Debtor shall:

(a)      <u>Future contracts for the Brine Boxes</u> The Debtor shall be authorized to enter into contracts for the use of the Brine Boxes.

(b)      <u>Issuance of New Equity.</u>   On the date upon which the Confirmation Order becomes a Final Order, the Reorganized Debtor may issue and/or sell a new membership interests which may dilute existing members by 50%.   Any new Investor must purchase at least 1 membership share of the debtor for an amount not less than

$15,000.00.    Prior to the Plan Effective Date, New Investor(s) shall deposit such purchase price into escrow with Debtor's counsel and such amount shall remain in escrow with the Debtor's counsel until the date upon which the Confirmation Order becomes a Final Order, when it shall be disbursed to the Reorganized Debtor in consideration for the issuance of the above-described shares to the New Investors who have executed the shareholder Agreement.  I think that this is not in compliance with the raise of any new equity as provided by the Settlement Agreement and needs to be changed? When any new capital is raised, it will remain subject to the Settlement Agreement between the Debtor and the Jordan Parties.

(c)    <u>Credit Facility</u>  On the Effective Date, the Matrix Energy Partners will make available to the Reorganized Debtor a credit facility (the "Credit Facility") in a principal amount of up to $80,000.00.  The Reorganized Debtor may draw upon such credit facility as necessary, to pay the payments to secured creditors to fund this Plan for payments to the "Jordan Parties"  Such credit facility will be secured by, among other things, a subordinate lien on all of the assets of the Debtor, which lien shall be subordinate to the liens of the Jordan Parties.  The Debtor may prepay Matrix Energy Partners at any time without prepayment penalties but such right to prepayment shall not be contrary to any of the terms and conditions of the Settlement Agreement with the Jordan Parties.

(d)    <u>Management of the Reorganized Debtor</u>  The Reorganized Debtor shall be managed by a board of directors consisting of a minimum of three members, Michael Havelka. David Schleis and Chris Berezney, who shall have permanent seats on the Board of Directors.    In the event that there is additional capital raised, the new

investors may agree to increase the board to five members and they will have the right to name a forth member who will be selected by the majority of the new investors. The Board of Directors will not receive compensation until after the class 3 is paid in full. The Board shall be reimbursed for any reasonable expenses they incur as members of the Board of Directors.

(e)    <u>Corporate Action</u>   All matters provided for under the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, or any corporate action to be taken by, or required of, the Debtor or the Reorganized Debtor, shall be deemed to have occurred and be effective as provided in the Plan and shall be authorized and approved in all respects without any requirement of further action by the stockholders or directors of the Debtor or the Reorganized Debtor, pursuant to Section 1903 of the Pennsylvania Business Corporation Law of 1988, as amended.

**5.3**    <u>Management of the Reorganized Debtor</u>    The Management of the Day to Day business affairs of the Debtor shall be conducted by Michael Havelka who shall be employed as the President and Chief Executive Officer. He shall contract with the Reorganized Debtor to work for an initial period of five years at a salary of $120,000.00 per year. This contract shall provide that he can only be terminated for material cause. The Agreement will be executed by the Reorganized Debtor upon the entry of the Confirmation Order. Pursuant to the Employment Agreement, the President and Chief Executive Officer will be responsible for all aspects of operating the business.

**5.4**    **Shareholder Agreement**    The Members of the Reorganized Debtor and any new investor will be bound by a Member Agreement that will be commercially reasonable and include the following terms:

A.      A board of Directors will have a minimum of three members.  Michael Havelka. David Schleis and Chris Berezney will have permanent seats on the Board of directors.  In the event that there is additional capital raised, the new investors may agree to increase the board to 5 members and they will have the right to name a fourth member who will be selected by the majority of the new investors.

B.      The Interests will be restricted.  No member may sell its membership interest in the Debtor and that membership interest may not be offered to the Public without first offering it to the company and then to the other shareholders. The company and then the other shareholders will have successive sixty (60) day periods to exercise their right to purchase the membership interest from the selling member.

C.      The Membership Interest in North Shore Energy Services, LLC shall not be pledged, hypothecated, assigned as collateral for any indebtedness of any shareholder. No Shares shall at any time be sold, transferred, pledged, or otherwise disposed of or encumbered in any manner whatsoever, except as elsewhere provided in the Agreement, unless such Shares are first offered to the other Shareholders and to the Company.   Until the termination of this Agreement, each of the Shares shall remain subject to the Agreement even though an offer or offers are made under this Agreement but not accepted, and each corporation (including the Company), partnership and person who may acquire any of the Shares in any manner, shall hold such Shares subject to the requirement that they shall be offerees under this Agreement whenever this Agreement may require. The Shareholders of the Reorganized Debtor shall be granted a right of first refusal to repurchase any stock issued any shareholder who desires to sell his or her shares.

All Membership Interest in the Reorganized Debtor shall bear a restrictive Endorsement as follows:

NOTICE

"The shares evidenced by this certificate are subject to the restrictions and options stated in, and are transferable only upon compliance with, the provisions of an agreement between North Shore Energy Services, LLC and Michael Havelka and David Schleis, a copy of which is on file in the office of the Secretary of North Shore Energy Services, LLC, and the provisions of which are incorporated herein by reference."

D.      Records will be maintained to current standards of business. Any shareholder member has the right to request an examination of the company records at any time at that shareholder's own expense. This right is limited to one (1) examination per calendar year.

E.      The controller function shall be performed by a David Schleis or his replacement selected by the Board of Directors. Any expense or purchase in excess of $50,000.00 must be approved by the Board of Directors.

F.      Every Member of the Reorganized Debtor must execute the Member Agreement. The Member Agreement will also require that there are no agreements other than those contained in the Shareholder Agreement and that it cannot be modified, except by writing signed by the parties.

G.      The shareholders will stipulate that it is impossible to measure in money the damages which will accrue to a party hereto or to the personal representatives of a decedent by reason of a failure to perform any of the obligations under this Agreement.  Therefore, if any party hereto or the personal representatives of a decedent shall institute any action proceeding to enforce the provisions hereof, any person (including the Company) against whom such action or proceeding is brought hereby waives the claim of defense therein that such party or such personal representatives has

or have an adequate remedy at law, and such person shall not urge any such action or proceeding the claim or defense that such remedy at law exists.

H.      The shareholder Agreement will be interpreted according to the Laws of Pennsylvania; the Venue for all litigation under the Shareholder Agreement will be Allegheny County Pennsylvania.

      **5.5**    **Employment Agreement with Michael Havelka** The Reorganized Debtor and Michael Havelka shall enter into an employment agreement which employs Michael Havelka as the Chief Executive under the terms set forth below:

      **5.5.1**    **Employment.**  Michael Havelka shall be employed as the President and Chief Executive Officer of the Company from confirmation, (the "Commencement Date"), for a period of five years (the "Initial Renewal Term") until the fifth anniversary of this Agreement, unless such employment is terminated earlier in accordance with this Agreement; provided, however, commencing on the third anniversary of this Agreement, the term of this Agreement shall be extended for a period of two (2) years (the  and, on the second anniversary of the Initial Renewal Term, the term of this Agreement shall be extended for a consecutive period of five (5) years, unless either party gives written notice to the other, at least 60 days prior to the end of the initial term or at least 60 days prior to the end of the "Initial Renewal Term".  The Executive shall have such duties and responsibilities customarily incident to such position or as may be designated to him by the Board of Directors of the Company (the "Board") from time to time.  The Executive shall be generally responsible for overseeing the operations of

the Company and meeting the reasonable performance standards and objectives as set by the Board of Directors.  Executive shall devote the majority of his time, attention and energies to the business and affairs of the Company.  He shall be permitted to continue to perform services for similar entities.    He shall not compete with the Debtor in any work for similar entities.  He shall agree to commit a minimum of 37 hours a week, on an annual average, to his full time employment with the Reorganized Debtor.

**5.5.2** **Salary.**  The Company shall pay Michael Havelka a salary at an annual rate of $120,000.00 less applicable deductions (the "Base Salary"), and such Base Salary may be increased at such times and in such amounts as determined by the Committee.  The Base Salary shall be payable by the Company to the Executive in installments at such times as the Company customarily pays its other employees.    Participation in deferred compensation, mandatory or discretionary bonus, retirement, stock option and other employee benefit plans and in fringe benefits shall not reduce the Base Salary. Michael Havelka has agreed to defer up to $60,000.00 per year of his annual salary depending on the cash flow and availability of funds.

**5.5.3** **Participation in Retirement, Welfare and Other Benefit Plans and Programs**. Michael Havelka shall be entitled to participate in all employee retirement and welfare benefit plans and programs, including health insurance, dental insurance, group life and long-term disability and 401(k) plan, made available to the Company's other employees, as such retirement

and welfare plans may be in effect from time to time and subject to the eligibility of such plans.

**5.5.4** **<u>Automobile</u>**.  The company shall provide Michael Havelka an automobile allowance in accordance with the Company's automobile allowance or reimbursement policy as approved from time to time by the Board of Directors and payable in accordance with the Company's policy. This allowance will not exceed $750.00 per month

**5.5.5** **<u>Vacation</u>**.  Michael Havelka shall be entitled to a minimum of three weeks paid vacation in accordance with the Company's vacation policy as approved from time to time by the Board of Directors, in addition to holidays and other paid time off (excluding vacation) provided to similarly situated executive officers of the Company.

**5.5.6** **<u>Business Expenses</u>**.  During such time as Michael Havelka is rendering services hereunder, the Executive shall be entitled to incur and be reimbursed by the Company for all reasonable business expenses, including but not limited to mobile telephone charges, entertainment and promotional gifts purchased for prospective customers.  The Company agrees that it will reimburse the Executive for all such expenses upon the presentation by Michael Havelka, on a monthly basis, of an itemized account of such expenditures setting forth the date, the purposes for which incurred, and the amounts thereof, together with such receipts showing payments in conformity with the Company's established policies. Reimbursement for approved expenses shall be made within a reasonable

period not to exceed 30 days after the approval of Michael Havelka's itemized account.

**5.5.7**  **Indemnity**.  The Company shall to the extent permitted by law, indemnify and hold Michael Havelka harmless from costs, expense (including reasonable attorneys fees) or liability arising out of or relating to any acts or decisions made by the Executive in the course of his employment to the same extent the Company indemnifies and holds harmless other officers, if any, and directors of the Company in accordance with the Company's established policies.    The Company agrees to continuously maintain Directors and Officers Liability Insurance with reasonable limits of coverage and to include the Executive with said coverage.

**5.5.8**  **Termination**.  This Agreement shall terminate on the fifth anniversary date of the Commencement Date, unless renewed pursuant to paragraph 1 above or sooner pursuant to any of the following:

   **A.  Death**.    This Agreement shall terminate upon Michael Havelka's death.  The company shall pay the Executive's estate (i) on the date it would have been payable to Executive any unpaid Base Salary earned prior to the date of Executive's death, (ii) within 30 days of the conclusion of the quarter following Executive's death, any unpaid Bonus prorated to the date of Executive's death, and (iii) any unpaid reimbursements due Executive for expenses incurred by the Executive prior to Executive's death, upon receipt from the Executive's personal representative of receipts therefore.  Any options that have not vested as of the date of Executive's death shall terminate on the date of Executive's death.    The Bonus will be determined by the Board of Directors.  Any Bonus shall not impair the Debtor's ability to pay classes 3, 4 and 5.

   **B.  Disability**.  If, as a result of Michael Havelka's permanent incapacity due to physical or mental illness, he shall have been absent from the full time performance of substantially all of his material duties with the Company for 120 consecutive days or 300 days total within any 18-

month period, his employment may be terminated by the Company for "Disability." Termination shall occur 30 days after a notice of a written termination is delivered to Executive by the Company (the "Effective Date of Termination"). The company shall pay the Executive (i) on the date it would have been payable to Executive, any unpaid Base Salary earned prior to the date of Executive's Effective Date of Termination, (ii) within 30 days of the end of the quarter following Executive's Effective Date of Termination, any unpaid Bonus prorated to the Executive's last day of actual employment, (iii) any unpaid reimbursements due Executive for expenses incurred by the Executive prior to Executive's effective Date of Termination, pursuant to paragraph 7, and (iv) if Executive is not covered by any other comprehensive insurance, the Company will pay Executive an amount equivalent to Executive's COBRA payments up to 18 months following the Effective Date of Termination or the maximum term allowable by then applicable law for coverage of Executive and his eligible dependents. Any options that have not vested as of the Executive's Effective Date of Termination shall terminate on the date of Executive's Effective Date of Termination. Michael Havelka has agreed to waive the insurance provision in this Paragraph until there are sufficient funds to pay it.

**C.** **<u>Cause</u>**. This Agreement may be terminated by the Company at any time for "Cause" by the delivery to Executive of a written notice of termination stating the date of termination and the basis upon which this Agreement is being terminated. As used in this Agreement, the term "Cause" shall include:

(i)    Intentional refusal to perform or observe any or all of Executive's material obligations ("Breach") under this Agreement which Breach remains uncured after written notice from the Company to the Executive and an opportunity to correct such performance within a reasonable period of time as determined by the Company, of at least 15 days after notice from the Company regarding the Breach;

(ii)    conviction of Executive of any felony or other crime involving dishonesty or moral turpitude;

(iii)    fraudulent conduct by the Executive or any act of dishonesty in connection with the Company's business;

(iv)    In the event of termination for Cause, Executive will only be entitled to such Base Salary and benefits as have accrued under this Agreement through the date of termination, but will

not be entitled to any other salary, benefits, bonuses or other compensation after such date.

D. **Without Cause**.    This Agreement may NOT be terminated by Company at any time without Cause during the first five year employment term.

E. **By Executive**.    Executive may terminate this Agreement upon 30 days written notice to the Company.    The Company shall pay the Executive (i) on the date it would have been payable to Executive, any unpaid Base Salary earned prior to the date of Executive's termination, and (ii) any unpaid reimbursements due Executive for expenses incurred by the Executive prior to the date of Executive's termination, pursuant to paragraphs 5 and 7.    Any options that have not vested as of the date of Executive's termination shall terminate on the date of Executive's termination.

F. **Expiration of Term**.    If the parties do not execute a new written agreement, upon expiration of the initial term of the Agreement, the employment of Executive shall continue on the same terms and conditions (including the then applicable compensation as provided in paragraphs above) as provided in this Agreement.    The parties acknowledge and agree that any such employment following the term shall be terminable "at will" for any reason, with or without cause, pursuant to applicable Pennsylvania law.

**(1) After the First Five Year Term,** This Agreement may also be terminated by Company, after the end of the initial 5 year employment, without Cause by the delivery to Executive of a written notice of termination not less than 30 days prior to the date of termination.    Upon such termination, Executive will be paid such Base Salary, vacation, prorated bonus and other benefits as have been earned under this Agreement through the date of termination (including, without limitation, the Company will pay Executive's COBRA payments for the earlier of the maximum term allowable by then applicable law or the date Executive becomes covered under a different health plan, for coverage of Executive and his eligible dependents).    So long as Executive reasonably cooperates in the transition of Executive's duties, as determined in the Company's sole but reasonable discretion, Executive will be paid an amount equivalent to his monthly Base Salary, on a monthly basis, for (6) months. Executive will receive the foregoing payment regardless of any mitigation.    Any options that have not vested as of the date of Executive's termination, shall fully vest as of the date of Executive's termination.    Except as provided in this paragraph, Executive will not be entitled to any other salary, benefits, bonuses or other compensation after such termination.

**5.5.8.1**        **Assignment**.

**5.5.8.1 (A)**        **No Assignment by Executive**.   This Agreement may not be assigned by   Executive.

**5.5.8.1 (B)** **Assignment by Company**.  This Agreement may be assigned by the Company provided that the Company shall require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree to perform under this Agreement in the same manner and to the same extent that the Company would be required to perform as if no such succession had taken place.

**5.5.9**        **Confidential Information**.  During the term of this Agreement and thereafter, the Executive shall not, except as may be required to perform his duties hereunder or as required by applicable law or court order, disclose to others for use, whether directly or indirectly, any Confidential Information regarding the Company.   "Confidential Information" shall mean information about the Company, its subsidiaries and affiliates, and their respective clients and customers that is not available to the general public and that was learned by the Executive in the course of his employment by the Company, including, without limitation, any data, formulae, recipes, methods, information, proprietary knowledge, trade secrets and client and customer lists and all papers, resumes, records and other documents containing such

Confidential Information.   The Executive acknowledges that such Confidential Information is specialized, unique in nature and of great value to the Company, and that such information gives the Company a competitive advantage.   Upon the termination of his employment, the Executive will promptly deliver to the Company all documents, maintained in any format, including electronic or print, (and all copies thereof) in his possession containing any Confidential information.

5.5.10    **Noncompetition**. Except as otherwise provided herein, the Executive agrees that during the term of this Agreement he will not directly compete with the Reorganized Debtor.

5.5.11    **Right to Company Materials**.   The Executive agrees that all styles, designs, recipes, lists, materials, books, files, reports, correspondence, records, and other documents ("Company Material") used, prepared, or made available to the Executive, shall be and shall remain the property of the Company.   Upon the termination of his employment and/or the expiration of this Agreement, all Company Materials shall be returned immediately to the Company, and Executive shall not make or retain any copies thereof.   This does not limit the right of Michael Havelka to retain his proprietary information

5.5.12    **Notice**.   For the purpose of this Agreement, notices and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered or when mailed by United States certified or registered mail, return receipt

requested, postage prepaid, addressed to the respective addresses set forth below, or to such other addresses as either party may have furnished to the other in writing in accordance herewith, exception that notice of a change of address shall be effective only upon actual receipt:

Company:   North Shore Energy Services, LLC
 3471 Babcock Blvd., Ste. 205
Pittsburgh, PA 15237

Executive:   Michael Havelka
115 Upper Arrowhead Dr.
Pittsburgh Pa 15227

**5.5.13**     **<u>Amendments or Additions</u>**.   No amendment or additions to this Agreement shall be binding unless in writing and signed by both parties hereto.

**5.5.14**     **<u>Paragraph Headings</u>**.   The paragraph headings used in this Agreement are included solely for convenience and shall not affect, or be used in connection with, the interpretation of this Agreement.

**5.5.15**     **<u>Severability</u>.**   The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.

**5.5.16**     **<u>Miscellaneous</u>**.

**A.**   No provision of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing and signed by the Executive and such officer as may be specifically designated by the Committee.

**B.**   No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

**C.**   No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which is not expressly set forth in this Agreement.   The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Pennsylvania without regard to its conflicts of law principles.

**D.**   Notwithstanding anything in this Agreement to the contrary, upon and following Executive's death, this Agreement shall inure to the benefit of and be enforceable by personal or legal representatives, executors, heirs, distributes, devisees and legatees of Michael Havelka, as the case may be, with respect to the payments due by the Company as set forth in this Agreement.

**5.6**   **Funding of Plan**   The Reorganized Debtor shall fund the Plan by using the profits from operating the assets, as well as the contributions by Michael Havelka and Matrix Energy Partners, LLC and future monies to be provided by any new investor. Without limiting the generality of the foregoing, the Plan will be implemented by the Reorganized Debtor through the continued operation of the business and through

revenue received from the operation of the Brine Boxes.  The Plan may also be funded in part by the addition of  new capital from investors as provided above.

**5.7**   <u>Disputed Claims Process and Litigation Necessary or Possible to Consummate Plan.</u>   After confirmation, the Reorganized Debtor shall have the sole power and authority and shall be entitled to and reserves the right to object to all Claims.  Specifically, the Reorganized Debtor shall file all Objections to Claims including secured claims, administrative claims, priority tax claims, priority non tax claims and general unsecured claims that are the subject of Proofs of Claim or requests the payment filed with the Bankruptcy Court, as soon as is practical, but in no event later than (a) 180 days after the Effective Date, or (b) such later date as may be approved by the Bankruptcy Court.

**5.8**   <u>No Distributions Pending Allowance</u> Notwithstanding any other provision of this Plan, if a claim or any portion of claim is disputed, no payment or distribution shall be made on account of the disputed portion of such claim or the entire claim if the entire claim is disputed, unless and until such claim becomes and allowed claim by Order of the Court or upon consent of the Reorganized Debtor.  The Disbursing Agent shall reserve from any distribution to holders of allowed claims an amount equal to the pro-rata share of all disputed claims.

**5.9**   <u>Litigation Necessary or Possible to Consummate Plan</u>.

    (A) Adversary complaints to the Jordan Parties- Settled.

    (B) Objection to any claims of creditors as to the amount of the claim or Objections to claims because the Debtor was not liable on the Debts.

    (C) Any actions to enforce the Plan.

    (D) Any chapter 5 actions.

**5.10**   Miscellaneous.

(A) After confirmation of the Amended Plan, the Reorganized Debtor shall have the exclusive right to negotiate with any administrative claimants, any secured creditors or any disputed creditor to discount or settle any dispute.   After Confirmation of the Amended Plan, the Reorganized Debtor and the Disbursing Agent will not need Court approval to discount or settle any claim(s), provided the creditor agrees to the alternative treatment that discounts or settles its claim(s).

(B)   All causes of action, all avoiding powers, and all choses in action of any type which were the property of the Debtor at the time of the commencement of this case and any defenses shall remain the property of the Reorganized Debtor under this Plan.

**5.11   Disbursing Agent**   The Disbursing Agent for Classes 7, 8 and 9 shall be Donald R. Calaiaro.

(A)   Once a payment has been made to the Disbursement Agent; it is no longer property of the Reorganized Debtor. It shall become property of the creditors.

(B)   All available funds for disbursement to Classes 5 and 6 will be distributed on a quarterly basis.

(C)   All Inquiries to the Disbursing agent shall be made in writing to Donald R. Calaiaro at 20 Warriors Road, Pittsburgh PA 15205.

(D)   The Disbursing Agent shall be entitled to compensation and reimbursement for costs as incurred on a monthly basis, but he shall be paid a $475.00 per month plus any bookkeeping fees, postage, copying and any other actual expenses incurred in the execution of his duties.

## ARTICLE 6 - PROVISIONS FOR CLAIMS AND EQUITY
## SECURITY INTERESTS GENERALLY

**6.1**    At the time the Confirmation Order becomes a Final Order, the Debtor and the reorganized Debtor shall have their relationships modified and superseded by the terms of the Plan, but if the Debtor have already entered into a Settlement Agreement with a creditor, that agreement is binding upon the reorganized Debtor.

The reorganized Debtor shall be deemed to have the benefits of Code Section 1141(c) and the Debtor shall be fully discharged and released by the effect of the confirmed plan, in accordance with the Bankruptcy Code.

**6.2**    In the event that the claim of any creditor is contingent, unliquidated or subject to dispute on the confirmation date, the Debtor or the Creditor may, in their sole discretion, request the Bankruptcy Court to estimate for the purpose of allowance under Section 502 of the Code, as soon as practicable after the confirmation date, **(a)** any disputed, contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of this Chapter 11 case, and **(b)** any right to payment arising from a right to an equitable remedy for breach of performance.

Any Disputed Creditor, who has not sought the right to vote an estimated amount prior to a hearing on the confirmation, shall not be entitled to vote upon this Plan of Reorganization.

**6.3**    **Post confirmation Injunction**    All entities that hold a claim against the Debtor are enjoined from taking any actions on account of any such claims, debts of liabilities:

A.    Commencing or continuing in any manner any action or other proceedings against the Reorganized Debtor, Debtor's Estate or any property included in that estate,

unless there has been a material default under the Confirmed Plan.

B.      Enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, perfecting any lien against Reorganized Debtor, Debtor's Estate or any property included in that estate, unless there has been a material default under the Confirmed Plan.

C.      Creating, perfecting or enforcing any lien or encumbrance Reorganized Debtor, Debtor's Estate or any property included in that estate, unless there has been a material default under the Confirmed Plan.

D.      Taking any action which is inconsistent with the Confirmed Plan.


## ARTICLE 7 - TREATMENT UNDER THE PLAN
## AND PROVISION FOR PAYMENT

**7.1**    <u>Administrative Claims</u>. The Class 1 claims, to the extent it is an allowed administrative claim, shall be paid their principal claim in full without interest on or before the distribution date by a cash payment to the holder of such a claim except as provided below or as otherwise agreed by each member of the class of persons in this class. Professional persons who are in Class 1 and whose claims have been finally approved and allowed by the court pursuant to Code Section 330 or 503 shall be paid on the Plan Effective Date. They shall be paid in full on the Plan effective date or in monthly installments in an amount that has been agreed to by the individual professional person with the Debtor.

**7.2**    The Class 2 claims of **Matrix Energy Partners, LLC**, which has an encumbrance on some of the Debtor's assets through a master loan and security agreement.

The alleged debt on the date of the Petition for Bankruptcy was, was $45,000.00. As of August 24, 2015, the debt was $ 66 848.06 as of August 24, 2015.

**Matrix Energy Partners, LLC** will have a Modified Secured Claim as set out in the Order of the Bankruptcy Court approving a settlement of Adversary actions at 15-2055 CMB and **15-02074 CMB**.  This settlement was approved by an Order of this Court on in the Order of the Bankruptcy Court approving a settlement of Adversary actions at 15-2055 CMB and **15-02074 CMB**.  This settlement was approved by an Order of this Court on July 17, 2015,  at Document No. 45 in Adversary 15-2055 CMB and at Document No. 26 at Adversary 15-2074 CMB.

The "Modified Secured Claim" shall be treated pursuant to the provisions of the Bankruptcy Code §1129 (b) (2) (A) as follows:

(A)   This secured creditor will realize the indubitable equivalent of its allowed Modified Secured Claim" on the date of distribution as provided in the Plan;

(B)   This secured creditor will receive treatment of its "Modified Secured Claim" in a manner consistent with the Bankruptcy Code:

(1) It will receive its "Modified Secured Claim" as allowed by the Bankruptcy Code, to the extent it is an allowed claim after modification and deduction for all credits for post petition adequate protection payments;
(2) It is impaired under this Plan

(C)   This secured creditor has a lien; such lien will be retained, as to the Reorganized Debtor, and will be retained, as modified, until this secured Creditor is paid the "Modified Secured Claim";

(E)   The Debt will be modified and restructured under this Plan.

(F)    The "Modified Secured Claim" will be subordinated to the "Jordan Parties" lien in accordance with the settlement.

(G)   The "Modified Secured Claim" will accrue post-confirmation interest at 8% simple interest per annum for the life of the obligation.

(H)  The debt will be a revolving line of credit and will be paid according to the ability of the Debtor. The Debtor shall be able to draw on this line up to the maximum credit facility limit off $ 80,000.00.

(I)  The lender may demand payment upon 30 days written notice and terminate the Credit Facility and the ability to draw future advances.

(J)  If the loan in not renewed and demand is made for payment at any time, the Debtor shall be permitted to pay the unpaid balance and interest over 1 year.

(K)  The Debtor may pay off the unpaid principal and accrued interest to Matrix Energy Partners, LLC at any time without any prepayment penalty. Same comment as above about prepayment.

**7.3**    The Class 3 claims of Raymond Jordan and JMC Brine Box LLC will be paid the amount of its allowed claim in full in accordance with the terms and conditions of settlement between the parties as set out in the Order of the Bankruptcy Court approving a settlement of Adversary actions at 15-2055 CMB and **15-02074 CMB**.  The settlement was approved on July 17, 2015, at Document No. 45 in Adversary 15-2055 CMB and at Document No. 26 at Adversary 15-2074 CMB. This settlement amount will be paid $915,000.00 with interest at the rate of 7% per annum as the Modified Secured Claim.

The "Modified Secured Claim" shall be treated pursuant to the provisions of the Bankruptcy Code §1129 (b) (2) (A) as follows:

(A)  This secured creditor will realize the indubitable equivalent of its allowed Modified Secured Claim" on the date of distribution as provided in the Plan;

(B)  This secured creditor will receive treatment of its "Modified Secured Claim" in a manner consistent with the Bankruptcy Code:

(1) It will receive its "Modified Secured Claim" as allowed by the Bankruptcy Code, to the extent it is an allowed claim after modification and deduction for all credits for post petition adequate protection payments;

(2) It is impaired under this Plan.

(3) The Modified Secured claim will be $915,000.00.

(C)    This secured creditor has a first priority lien; such lien will be retained, as to the Reorganized Debtor, and will be retained, as modified, until this secured Creditor is paid the "Modified Secured Claim";

(D)    The Debt will be modified and restructured under this Plan.

(E)    Withdrawal of Motion to Dismiss. After the entry of a final order approving of the Settlement Agreement in the Bankruptcy Case ("Approval"), the Brine Box Parties shall withdraw and/or dismiss the Motion to Dismiss and the Motion for Relief from Stay as moot

(F)    Dismissal of the Pending Texas Court Actions. The Parties agree that upon the entry of a final order confirming any plan of reorganization of the Bankruptcy Case that incorporates the terms and conditions of the "Settlement Agreement" that the parties in the Federal Court Action shall sign a Joint Stipulation For Dismissal With Prejudice, and such other pleadings mutually approved by the attorneys in such action that are needed to jointly dismiss such action with prejudice.

(G)    Rejection and Termination of the Contracts with the Brine Box Parties. The Brine Box Parties agree that the contracts, (the Founder's Club Term Sheet, the Addendum and the Supplemental Memorandum of Understanding) between any of them and any North Shore Party shall be terminated and that they shall have no further rights, except those rights specifically retained under the Settlement Agreement any confirmed plan of reorganization incorporated the terms of the Settlement Agreement, the Disparagement Agreement, the Promissory Note and Security Agreement. Specifically, the "Brine Box Parties" waive any right to convert any debt to equity in North Shore Energy Services, LLC or North Shore Energy Services, LP and they waive any future right to fabricate or construct brine boxes using the proprietary information or process of the North Shore Parties.

(H)    Mutual Release.    Upon the entry of a final order confirming    the Plan of Reorganization or under paragraph V (4) (F) the Parties shall be released from any claims in accordance with the Settlement Agreement.

(I)    Settlement Payment.    Damages Claim. JMC Brine Box, LLC, Raymond Jordan, Jordan Manufacturing Consulting LLC, and Brine Box Services, LLC shall have an aggregate, allowed claim against North Shore Energy Services, LLC for damages in the principal amount of $915,000.00(the "Damages Claim").

1. Payments.

A.  Prior to confirmation

The net income from the 2 brine boxes, as defined in the budget, attached to  the order approving the Debtor's right to contract the use of the Brine Boxes,  will be paid into an escrow account and shall be held in that account until the confirmation of the Plan of Reorganization. Upon confirmation of the Plan of Reorganization, the accumulated funds in the escrow account shall be distributed to JMC Brine Box, LLC, Raymond Jordan, Jordan Manufacturing Consulting LLC, and Brine Box Services, LLC and applied to the principal amount of $915,000.00..

B.  After Confirmation

North Shore Energy Services, LLC[3] shall pay JMC Brine Box, LLC, or its assignee a minimum  payment,  of greater of (a) interest only calculated on the principal due, of approximately $ ( 6,130.50) dollars per month for a period of six (6) months after the Plan Effective Date of the Chapter 11 Plan of Reorganization for North Shore Energy Services, LLC. and (b) 15% of the gross revenue of North Shore Energy Services, LLC for the prior month (including any new brine boxes), and 15% of all outside capital raised from the prior month.

Beginning in Month seven (7), for a period of fifty-four (54) months, North Shore Energy Services, LLC shall pay a minimum payment,  of greater of (a) principal and interest, estimated to be $19,802.04) monthly until the debt is paid in full over the next 54 months and  (b)15% of the gross revenue of North Shore Energy Services, LLC for the prior month (including any new brine boxes) and 30% of all outside capital raised from the prior month,.

---

[3]  North Shore Energy Services, LLC also includes the Debtor and the reorganized Debtor.

5. On the Plan Effective, the Parties shall apply all money paid into escrow prior to the plan effective date pursuant to paragraph A above.

6. After the first 6 months, the JMC Brine Box parties shall calculate a monthly payment of principal and interest to amortize the remaining obligation over the next 54 months.

1. This payment obligation will be secured by a first priority UCC- 1 security interest in the 2 Brine Boxes and the accounts receivable. Matrix Energy Partners, LLC will subordinate its lien to this new security interest.  The Debtor shall execute a commercially reasonable note and security agreement consistent with this Settlement Agreement. The collateral shall also include all after acquired assets including but not limited to contracts and accounts receivable but excluding any new brine boxes.

In the event of a default, the JMC Brine Box Parties will give notice of the alleged default to the Debtor and the Debtor shall cure any default within 30 days after payment default and within 15 days after covenant default.

A default will occur if:

1. Failure to cure payment default within 30 days of written notice;
2. Failure to cure covenant default within 15 days of written notice; or
3. Failure to confirm plan or conversion to Chapter 7

The JMC Brine Box Parties shall have the following remedies:

1. Typical remedies in commercial loan agreement

2. JMC Brine Box, LLC has right to file notice with Bankruptcy Court that an event of default has occurred

    A. North Shore Energy Services, LLC has 14 days from date of notice to object solely with respect to whether an event of default has occurred; if no objection or Bankruptcy Court overrules objection, title and possession of the brine boxes

will be awarded immediately to JMC Brine Box, LLC by order of the Bankruptcy Court;

B.    If an objection is filed, North Shore Energy Services, LLC agrees to an expedited hearing at Bankruptcy Court's earliest convenience.

C.    These provisions must be incorporated expressly into plan of reorganization.

D.    In the event that JMC repossesses the 2 brine Boxes, it shall be granted a perpetual license to use any patented or proprietary technology with respect to 2 brine boxes for no license or royalty fee to Havelka. This provision is subject to a non-disclosure agreement and the Brine Box parties shall ensure that any party who uses this technology shall take all necessary efforts to protect the proprietary information from disclosure to the public and shall limit the use of the Brine Boxes to parties who have agreed to the non-disclosure agreement.

Miscellaneous Terms and Conditions

7.    <u>Entire Agreement</u>. This Settlement Agreement contains the entire Settlement Agreement and understanding concerning the subject matter hereof between the Parties hereto, superseding and replacing all prior negotiations, understandings, representations and agreements of any kind, whether written or oral.  This Settlement Agreement shall be binding upon the Parties, their predecessors, successors, parents, subsidiaries, affiliates, assigns, agents, directors, officers, employees and stockholders. No modification, amendment, waiver, termination or discharge of this Settlement Agreement, or any of the terms or provisions hereof, shall be binding upon any of the Parties unless confirmed by a written instrument signed by all Parties.  The Settlement Agreement and its terms are not confidential or subject to any confidentiality provision.

8.    <u>No Admissions</u>.  Nothing contained in this Settlement Agreement,
including the releases granted or provided for herein (the
"Releases"), is to be construed as any admission of liability by any of
the Parties hereto or by any party thereto, or any admission of liability
with respect to any claims or allegations in the Bankruptcy Case, the
State Court Action, Federal Court Action, Injunctive Adversary,
Ownership Adversary or any other action.  Any such liability is
expressly denied by each of the Parties.  Nothing contained in this
Agreement nor anything said or communicated in the course of
negotiating this Agreement may be offered in any proceeding,
including the Bankruptcy Case, the State Court Actions, Federal
Court Action, Injunctive Adversary, Ownership Adversary, or any
other action as evidence of any liability or wrongdoing by any Party or
lack thereof; provided, that this Settlement Agreement and all
communications and statements made in connection herewith may
be introduced in any proceeding to enforce any of the terms of this
Settlement Agreement.

9.    Debtor shall continue to maintain and provide GPS Tracking on the 2
Brine Boxes.

10.    The North Shore Parties shall provide to the Brine Box Parties
monthly financial statements.

11.    Debtor shall provide insurance coverage on the 2 Brine Boxes
satisfactory to JMC Brine Box LLC.

12.    The North Shore Parties shall provide full disclosure of location of the
2 Brine Boxes.

13.    The North Shore Parties shall provide advance written notice of
movement of the 2 Brine Boxes.

14.    The North Shore Parties shall fund regular maintenance and repair to make sure that the 2 Brine Boxes are in good working condition.

15.    The North Shore Parties shall make its books and records available for an outside auditor to inspect same on a quarterly basis with the costs of the outside auditor being borne by the Brine Box Parties.

16.    The Debtor will not sell, dismantle or otherwise tamper with the current configuration of the 2 Brine Boxes in any way that would make them unusable or reduce their value in any way.

17.    In the event the settlement terms contemplated above   are not fully implemented within the milestones set forth herein, North Shore Energy Services, LLC shall promptly transfer ownership of the brine boxes to JMC Brine Box, LLC or its assignee pursuant to an Order of the Bankruptcy Court.   In such a "doomsday scenario", the mutual releases shall remain effective and JMC Brine Box, LLC and its affiliates disclaim any "deficiency claim" against North Shore Energy Services, LLC or any of its affiliates.

18.    The Plan is consistent with the settlement of the Parties; to the extent there is any inconsistency, the settlement agreement controls the treatment of this class.

19.    Cancellation of Prior Agreements   Upon approval of the settlement by the Bankruptcy Court, all agreements between the parties are terminated and the parties shall have no rights except those specifically retained by this settlement agreement;

20.    The Brine Box Parties have relinquished any right to convert debt into equity in North Shore Energy Services, LLC or North Shore Energy Services, LP.

21.   The Brine Box Parties have relinquished any right to fabricate future brine boxes.   The Brine Box parties agree that they have no ownership or claim upon the proprietary information, process or technology, developed by Havelka, and used in the brine boxes.

22.   The Brine Box Parties shall remain bound by the 2013 Non-disclosure agreement and they shall not disclose any proprietary information to any third party regarding the brine box technology, process or information.

23.   <u>Confidentiality of Settlement Agreement</u>   The Settlement Agreement will be disclosed to the Bankruptcy Court and creditors in conjunction with a Motion to Approve this Settlement Agreement. After approval of the settlement agreement, the terms of the Settlement Agreement will not be disclosed to any third party.   As part of this Settlement Agreement, the Parties shall execute a mutual non-disparagement agreement and shall not make any false or negative statement to any third party about any party or product in this dispute.

24.   <u>Non- Interference</u>   The Parties agree not to interfere with each other's business in any direct or indirect manner. Neither party will contact any customer or vendor of any party to this settlement and interfere in any relationship.

25.   <u>Attorney's Fees</u>.  In the event of any further litigation, action, appeal or other proceeding arising from, concerning or related to the enforcement or breach of this Settlement Agreement, the prevailing Party shall be entitled to recover from the non-prevailing Party(ies) all costs (including without limitation, staff time and court costs), reasonable attorneys' fees, and all other expenses and fees incurred in such litigation, action, appeal or other proceeding. All attorneys' fees incurred by the parties prior to the settlement shall be borne by the respective parties.

26.  <u>Choice of Law; Forum</u>.   This Settlement Agreement shall be governed by, construed and enforced in accordance with the substantive laws of the Commonwealth of Pennsylvania without giving effect to the conflicts of law principles thereof.  Any dispute regarding this Settlement Agreement shall be resolved in the Bankruptcy Court for the Western District of Pennsylvania. Should any provisions of this Settlement Agreement be held invalid or unenforceable, all other provisions shall nevertheless continue in full force and effect.

**7.4**    The Class 4 Class consists of the executory contract with Michael Havelka, licensing the proprietary information and process to the Debtor. That contract will be assumed   There are no royalties due to Michael Havelka as of September 10, 2015.  The executory contract of the debtor with Michael Havelka for the licensed use of his proprietary information, "The Brine Box Technology" will be retained without modification. This technology is defined as:

A. The entirety of the Intellectual Property package used in the treating flow back, produced and drilling water as well as a host of related applications of the Brine Box.

B. The Frac View technology that includes the entirety of the Intellectual Property package used in the monitoring and reporting of water quality in the Brine Box for the oil and gas industry, as well as related water recycling applications.

C. The surface modified adsorbent technology that includes surface modified zeolites, activated carbons and activated alumina.   Also included are future modifications that may increase efficiency of the adsorbents in the Brine Box.   The modifications include physical, chemical and thermal technologies.

The Debtor is authorized to use his process[4] for the payment of royalties, as required by the Agreement between Michael Havelka and North Shore Energy Services, LLC, which was reduced to writing on March 26, 2015. The agreement lasts for a five year period. The Parties are required to protect the confidentiality of the Proprietary Information and Process relating to the Brine Box and the media. North Shore Energy Services, LLC is required to pay a royalty for the use of this technology:

5. The Brine Box royalty rate shall be calculated monthly based on the price and utilization of the Brine Boxes.  This rate shall be 2% of the gross profit achieved by North Shore Energy Services, LLC.
6. These royalties shall be accrued and payment deferred until North Shore has adequate final means.   In addition, the royalties can be converted to debt or equity instruments at the approval of North Shore's Board of Directors.
7. The Frac View is integral to Brine Box operation and no additional billings are made based on its presence.  The royalties for Frac View are covered in the Brine Box royalty rate.
8. The media royalty rate shall be set at 20% of the net profit (cost of media minus sales price). These royalties shall be accrued and payment deferred until North Shore has adequate financial means.   In addition, the royalties on the media can be converted to debt or equity instruments at the approval of North Shore Board of Directors.

The Parties may modify this agreement; but it must be modified in writing and approved by both parties. The Debtor may only agree to modify this contract by action of the Board of Directors.

**7.5**     The Class 5 claims of Unsecured Creditors will be paid 100% of their allowed pre-petition claims of approximately $162,578.77. The projected dividend to Class 5 is 100%.

The Debtor will pay 36 equal payments each month plus any amount due to the Disbursing Agent each month following the 12 month following the Plan Effective Date. The Disbursing Agent shall make quarterly distributions to Class 5 creditors, which have

---

[4] The Patent is pending.

allowed and undisputed claims. The Class 5 creditors shall not be entitled to post bankruptcy interest. The monthly payment is projected to be $ 4,740.00.

### 7.5.1 Suspension of Payments to Class (5) if the Reorganized Debtor does not have sufficient income

The Reorganized Debtor shall have the option to suspend and postpone two monthly payments to Class 5 per calendar year when it does not get paid for any month in which the gross income is less than $ 40,000.00.

**7.5.2** All creditors must give notice of any default to the Debtor and their counsel by written notice specifying the alleged default and the action needed to cure the default. The Debtor shall have (30) thirty days to cure any default after receipt of that notice. No creditor may enforce any right or enforce any lien until this notice and opportunity to cure have been given. All notices of default must be mailed to the Debtor at their last known address; AND a copy of that notice shall be mailed to Donald R. Calaiaro at 428 Forbes Avenue, Suite 900, Pittsburgh PA, 15219. All notices under this paragraph must be sent by certified mail, return receipt requested to be effective. The terms of these notice rights must be strictly enforced as a condition precedent to any rights under this Amended Plan.

**7.6** The Class 6 Insiders The Class 6 will be paid 100% of their allowed pre-petition claims of approximately $429,000.00. The projected dividend to Class 6 is 100%.

The Debtor will pay 84 equal payments each month plus any amount due to the Disbursing Agent each month following the 18th month following the Plan Effective Date. The Disbursing Agent shall make quarterly distributions to Class 6 creditors, which have allowed and undisputed claims. The Class 6 creditors shall not be entitled to post bankruptcy interest.

The monthly payment is projected to be $ 5,060.00.

**7.6.1**   Suspension of Payments to Class (6) if the Reorganized Debtor does not have sufficient income

The Reorganized Debtor shall have the option to suspend and postpone two monthly payments to Class 5 per calendar year when it does not get paid for any month in which the gross income is less than $ 45,000.00.

**7.6.2**   All creditors must give notice of any default to the Debtor and their counsel by written notice specifying the alleged default and the action needed to cure the default. The Debtor shall have (30) thirty days to cure any default after receipt of that notice.   No creditor may enforce any right or enforce any lien until this notice and opportunity to cure have been given.   All notices of default must be mailed to the Debtor at their last known address; AND a copy of that notice shall be mailed to Donald R. Calaiaro at 428 Forbes Avenue, Suite 900, Pittsburgh PA, 15219.   All notices under this paragraph must be sent by certified mail, return receipt requested to be effective.   The terms of these notice rights must be strictly enforced as a condition precedent to any rights under this Amended Plan.

**7.7**   The Equity Shareholders On the Effective Date, all Equity Interests of the Debtor shall be retained but modified. The Reorganized debtor shall not issue any dividends nor make any loans to shareholders until all prior classes have been paid in full. In order to improve plan feasibility, Michael Havelka has agreed that his post-confirmation salary for 2015 will not exceed $ 120,000.00 per year; this salary shall not be increased until after Jan. 1, 2016.   After January 1, 2016, Michael Havelka's salary may be increased only if the debtor is current on payments to classes 2, 3, 5 and 6.

## ARTICLE 8 - RETENTION OF JURISDICTION

**8.1**    The Bankruptcy Court shall, after the confirmation date and until final consummation, be entitled to exercise exclusive jurisdiction over the following matters:

(a)    To consider any modification of this Plan pursuant to Section 1127 of the Code;

(b)    To determine the allowance of all claims against the Debtor pursuant to Section 502 of the Code;

(c)    To hear and determine any objections filed within thirty (30) days after confirmation date to the allowance of any claim;

(d)    To hear and determine any adversary proceeding or contested matter, controversy, suit or dispute over which the Bankruptcy Court has jurisdiction under 28 U.S.C. Sections 157 and 1334;

(e)    To hear and determine any issues with respect to the Debtor's settlement with a creditor, if the creditor requests court intervention.

(f)    To hear and determine all controversies, suits and disputes that may arise in connection with the interpretation or enforcement of the Plan;

(g)    To issue such orders as may be necessary for the administration and/or consummation of this Plan, including complaints to determine secured claims;

(h)    To set and determine all professional fees and other costs of administration in this Chapter 11 cases;

(i)     For such other purposes as may be set forth in the Confirmation Order; and

(j)    This Court may retain Jurisdiction over specifically enumerated matters even though a final decree may be entered.

## ARTICLE 9 - GENERAL PROVISIONS

**9.1**    <u>Amendments.</u>  The Plan Proponent may amend this Plan at any time prior to the confirmation date, provided there is notice and an objection period provided to the

Debtor's creditors and thereafter as provided in Section 1127 of the Code.

**9.1A**    <u>Plan Controls</u>.  In the event, and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control. Nonetheless, the settlement Agreement with the "Brine Box" parties controls any inconsistency as to them.

**9.2**    <u>Headings</u>.    The headings included in this Plan are for the sake of convenience and reference only and shall not constitute part of this Plan for any other purpose.

**9.3**    <u>Interest.</u>  Except as specifically set forth in the Plan or in any Final Order of the Court entered during this Chapter 11 case, interest shall be deemed not to have accrued with respect to any claim since the filing date and no payment of interest will be made or allowed pursuant to the Plan.

**9.4**    This Plan contemplates that the case will be closed and a final decree will be entered as soon as all of the following have occurred:

(a)    All fee applications have been filed and approved.  No fee application shall be allowed unless they have been filed prior to forty-five (45) days after the Order of Confirmation is entered;

(b)    All objections to claims and adversary actions are filed and finally resolved;

(c)    The Debtor has compiled with the Post-Confirmation Order.

**9.5**    The rights of Class 9 to payments under this Plan by the Debtor will be an unsecured obligation of the reorganized Debtor.

## <u>ARTICLE 10 - AMENDMENT</u>

**10.1**    The proponent of the Plan reserves the right to amend this Plan prior to confirmation.

**Respectfully Submitted,**

**Date:** September 10, 2015

**BY:**      /s/ Donald R. Calaiaro
**Donald R. Calaiaro, Esq. PA ID #27538**
**dcalaiaro@c-vlaw.com**
**CALAIARO VALENCIK**
**428 Forbes Avenue, Suite 900**
**Pittsburgh, PA  15219-1621**
**(412) 232-0930**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE:** | ) **Case No.**  15-20390 CMB |
| North Shore Energy Services, LLC, | ) **Chapter** 11 |
| **Debtor.** | )  **Document No.** |

## CERTIFICATE OF SERVICE OF
### Chapter 11 Plan of Reorganization September 10, 2015

I certify under penalty of perjury that I served the above captioned pleading on the parties at the addresses specified below or on the attached list on September 10, 2015.

Heather Sprague, Esquire, Office of the U.S. Trustee, 1001 Liberty Avenue, Liberty Center, Suite 970, Pittsburgh, PA  15222; Heather.Sprague@usdoj.gov

North Shore Energy Services, LLC, 3471 Babcock Blvd., Ste. 205, Pittsburgh, PA 15237; michaelhavelka@me.com

Robin Cheatham, One Shell Square, 701 Poydras Street, Suite 4500, New Orleans, LA 70139; Robin.Cheatham@arlaw.com]

Luke Sizemore, Reed Smith Center, 225 Fifth Avenue, Suite 1200, Pittsburgh PA 15222; LSizemore@ReedSmith.com

The type(s) of service made on the parties (first-class mail, electronic notification, hand delivery, or another type of service) was: ELECTRONIC NOTIFICATION.

If more than one method of service was employed, this certificate of service groups the parties by the type of service. For example, the names and addresses of parties served by electronic notice will be listed under the heading "Service by Electronic Notification," and those served by mail will be listed under the heading "Service by First-Class Mail."

EXECUTED ON: September 10, 2015          /s/ Donald R. Calaiaro

**Donald R. Calaiaro, Esq. PA ID#27538**
**dcalaiaro@c-vlaw.com**
**CALAIARO VALENCIK**
**428 Forbes Avenue, Suite 900**
**Pittsburgh, PA  15219-1621**
**(412) 232-0930**